UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANITA TALEVSKI,<br><br>　　　　　　　　Plaintiff,<br>　　v.<br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>　　　　　　　　Defendant. | CASE NO. 13cv0958 JM(JMA)<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT |

Defendant Regents of the University of California ("Regents") moves for summary judgment on the Rehabilitation Act claim, the only viable claim stated by Plaintiff. Plaintiff Anita Talevski opposes the motion. Pursuant to Local Rule 7.1(d)(1) the court finds the matters presented appropriate for resolution without oral argument. For the reasons set forth below, the court denies summary judgment in part on the Rehabilitation Act claim and grants partial summary judgment on the failure to accommodate claim.

**BACKGROUND**

On April 22, 2013, Plaintiff commenced this disability rights action by alleging seven causes of action for (1) violation of Title II of the Americans with Disabilities Act ("ADA"); (2) violation of §504 of the Rehabilitation Act; (3) violation of the Unruh Civil Rights Act, Cal. Civ. Code §51; (4) violation of the Disabled Persons Act, Cal. Civ. Code §54; (5) disability discrimination in violation of Cal. Gov. Code

1  §11135; (6) disability discrimination in violation of Cal. Civ. Code §3345; and (7) violation of the Unfair Business Practices Act, Bus. & Prof Code §17200. (Ct. Dkt. 1). On August 13, 2013, the court granted Defendant's motion to dismiss all claims except the Rehabilitation Act, finding that the Eleventh Amendment barred the claims against Regents. (Ct. Dkt. 7).

Plaintiff's claims arise from a series of events commencing in late 2011 and continuing until early 2012. "Plaintiff suffered a traumatic brain injury early in life and has been disabled ever since." (Compl. ¶5). Plaintiff suffers from bi-polar disorder, receives disability benefits from the State of California, and is a disabled individual within the meaning of the ADA. Id.

In addition to educational programs, the University of California San Diego ("UCSD") also operates recreational programs open to the general public. Plaintiff enrolled in UCSD's Triathlon Program. The coaches in the program were aware of "the nature of Plaintiff's disability." (Compl. ¶10). One day in late 2011 or 2012, Coach Piszkin was running a workout on the track. While coaching Plaintiff, Coach Piszkin allegedly touched Plaintiff in the midriff "in what Plaintiff perceived was an inappropriately and unwelcome familiar manner." (Compl. ¶11). During this same period of time, Plaintiff stopped taking her medications, leading to "occasional emotional outbursts or need for attention." (Compl. ¶14). At about this same time, Plaintiff developed "a harmless yet obsessive affection for another participant in the program who happened to be a Navy Seal." Id. Plaintiff attempted to contact the Navy Seal by sending numerous emails to the Navy and the triathlon coaches.

On January 31, 2012, Plaintiff was informed by the Director of Recreation that her behavior violated "the Athletes and Coaches Code of Conduct for the Masters Sports Program" and was suspended from the program. (Compl. ¶16). The letter provided to Plaintiff stated, among other things:

a. "You regularly blurted out comments during the workout that were inappropriate and loud.

      b. You became angry at a fellow swimmer because you felt she spoke to you in a degrading manner.

      c. During the course of the workout you would randomly complain about people in your life that were apparently bullying you.

      d. You have, on a few occasions, had crying outbursts because of some of your own personal struggles.

      e. You had been excessively attempting to contact a fellow runner in one of the workouts which allegedly included sending about 20 emails to the Navy trying to track him down. You sent the coaches several emails trying to get info about him. Your constant emails to the coaches were a form of harassment." (Compl. ¶17).

      Plaintiff alleges that her conduct was "the result of a person with manic-depressive disorder as they were manifestations of the despair, irritability, insecurity, and obsessive compulsive behavior that are among the classic symptoms of bi-polar disorder." On February 6, 2012, Plaintiff was expelled from the sports program. (Compl. ¶20).

      Regents moves for summary judgment on the Rehabilitation Act claim, arguing that Plaintiff fails to establish a prima facie case and, even if she could, Regents had a legitimate non-discriminatory reason for dismissing Plaintiff from the program - she violated the Code of Conduct. Plaintiff opposes the motion.

## DISCUSSION

**Legal Standards**

      A motion for summary judgment shall be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Prison Legal News v. Lehman, 397 F.3d 692, 698 (9th Cir. 2005). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the file which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). There is "no express or implied requirement in Rule 56 that

the moving party support its motion with affidavits or other similar materials <u>negating</u> the opponent's claim." <u>Id.</u> (emphasis in original). The opposing party cannot rest on the mere allegations or denials of a pleading, but must "go beyond the pleadings and by [the party's] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Id.</u> at 324 (citation omitted). The opposing party also may not rely solely on conclusory allegations unsupported by factual data. <u>Taylor v. List</u>, 880 F.2d 1040, 1045 (9th Cir. 1989).

The court must examine the evidence in the light most favorable to the non-moving party. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962). Any doubt as to the existence of any issue of material fact requires denial of the motion. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). On a motion for summary judgment, when "'the <u>moving party</u> bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial.'" <u>Houghton v. South</u>, 965 F.2d 1532, 1536 (9th Cir. 1992) (emphasis in original) (quoting <u>International Shortstop, Inc. v. Rally's, Inc.</u>, 939 F.2d 1257, 1264-65 (5th Cir. 1991), <u>cert. denied</u>, 502 U.S. 1059 (1992)).

**The Prima Facie Case**

To state a claim under the Rehabilitation Act, a plaintiff must allege "(1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance." <u>O'Guinn v. Lovelock Correctional Center</u>, 502 F.3d 1056, 1060 (9th Cir. 2007) (quoting <u>Duvall v. County of Kitsap</u>, 260 F.3d 1124, 1135 (9th Cir.2001)); 29 U.S.C. §794(a). Once Plaintiff establishes a prima facie case, the <u>McDonnell Douglas</u> framework applicable to Rehabilitation Act claims shifts the burden to Defendant to articulate a legitimate, non-discriminatory reason for its action with the burden shifting back to Plaintiff to prove that the proffered legitimate reason is a pretext for discrimination. <u>Smith v. Barton</u>, 914 F.2d 1330, 1339-

40 (9th Cir. 1990).

Applying the evidence to the Rehabilitation Act claim, the court concludes that genuine issues of material fact prevent entry of summary judgment on the prima facie case. The parties do not dispute the first and third elements, Plaintiff is an individual diagnosed with a recognized disability, Bipolar Disorder Type 1, (Talevski Decl. ¶3), and UCSD receives federal financial assistance. The parties dispute whether Plaintiff was otherwise qualified to participate in the recreational program. Under the Rehabilitation Act, a qualified individual is "one who is able to meet all of a program's requirements in spite of [her] handicap," with or without accommodation. Southeastern Cmty. Coll. v. Davis, 442 U.S. 397, 406 (1979).

UCSD's Recreation Department provides recreation programs for students, faculty, staff, and the community at large. One program, called the Master Sports Program ("Program"), provides running, swimming, and triathlon training. (Koch Decl. ¶2). The Program offered group classes, and did not offer one-on-one coaching. The group workout sessions consist of about 50 participants each class, with some sessions numbering 100 athletes. On average, approximately 400 individuals participate in the Program each quarter and may attend any of 27 different workout sessions during the week. (Marcikic Decl. ¶4). The personnel in the Program consists of two full-time coaches (Ronald Marcikic and Terry Martin) and about 16 other part-time assistant coaches.

The high number of participants in the programs requires that the coaches "remain alert and focused on potential safety issues." (Marcikic Decl. ¶5). Marcikic provides the example where 1-2 coaches would be responsible for a swimming session with 85 participants. "With so many participants in the pool pushing themselves to their physical limits, it is of critical importance for the coach to be fully focused on monitoring the athletes, and avoiding distractions during practice whenever possible." Id.

In order to participate in the Program, each participant was required to read, sign,

1 and abide by the Athlete and Coaches Code of Conduct ("Code"). The Code required
2 participants to "be courteous and polite during all scheduled workouts," "treat each
3 other with respect and courtesy," refrain from "unreasonable loud, abusive, negative
4 or foul language," refrain from "anger directed at another athlete or coach," refrain
5 from "physical or emotional outbursts during scheduled workouts," and refrain from
6 any kind of harassment directed toward another athlete or coach." (Kock Decl. ¶4,
7 Exh. 3). When Plaintiff commenced the program in 2009, and again every quarter
8 throughout her participation in the Program, Plaintiff acknowledged that she would
9 abide by the Code. (Talevski Depo., 196:12-197:10).

10 Plaintiff's evidence shows that she successfully participated in the Program from
11 2009 "until at least the latter part of 2011 when she started to experience a depressive
12 episode." (Oppo. at p.10:11-13). Plaintiff informed Coaches Martin and Piszkin about
13 her disability as soon as she enrolled in the Program. (Talevski Decl. ¶3). During this
14 two and one half year period, the evidence submitted by Defendant shows that
15 Plaintiff's "condition manifested itself in several minor ways" through inappropriate
16 comments, following coaches during practice, engaging coaches in personal
17 conversations while coaching other participants, and sending numerous emails to the
18 coaches. (Martin Decl. ¶9; Piskin Decl. ¶3). Notwithstanding these "minor," as
19 characterized by Defendant, disruptions in the Program attributable to Plaintiff's
20 disability, Plaintiff was able to successfully participate in the Program, including
21 general compliance with the Code. Such evidence is sufficient to establish a prima
22 facie case, and Plaintiff meets her burden by establishing a prima facie case.

23 In an attempt to rebut the prima facie case, Defendant submits evidence to show
24 that Plaintiff displayed erratic behavior at the end of 2011 and into 2012 when she
25 stopped taking her medication and began consuming alcohol and marijuana to self-
26 medicate. (Talevski ¶22; Depo. at p.90:6-19). As explained by Plaintiff, when she
27 "fall[s] into a depression and [has] a manic episode [she] become[s] needy and
28 impulsive." Id. While Defendant argues that Plaintiff could not comply with the Code

because of her disability, this evidence, and related argument, is insufficient to conclusively rebut Plaintiff's prima facie case. At a minimum, there is a question of fact as to whether Defendant's evidence rebuts the prima facie case.

In sum, the court denies Defendant's motion for summary judgment on whether Plaintiff has established a prima facie case.

**Non-Discriminatory Reasons for Plaintiff's Termination From the Program**

Defendant argues that it had a legitimate reason for terminating Plaintiff's participation in the Program because she violated the Code. Plaintiff does not dispute that the Code is an integral aspect of the Program. (Oppo. at p.13:17-18). Rather, Plaintiff disputes that her conduct violated the Code or that Defendant accommodated her disability.

Unlike the circumstances described in the authorities cited by the parties (Rehabilitation Act claims arising in the context of elementary or secondary education and employment situations), the Program is self-funded and provides about 27 group classes per week. Class sizes average about 50 participants with one to two coaches per class. Plaintiff participated in approximately 5 classes per week, four swimming and one running class. Each participant in the Program is required to abide by the Code. The Code requires participants to "be courteous and polite during all scheduled workouts," "treat each other with respect and courtesy," refrain from "unreasonably loud, abusive, negative or foul language," refrain from "anger directed at another athlete or coach," refrain from "physical or emotional outbursts during scheduled workouts," and refrain from "any kind of harassment directed toward another athlete or coach." (Koch Dec. ¶ 4; Marcikic Dec. ¶ 6; Exh. 3). Failure to abide by the Code may lead to discipline, and about 5-7 participants have been dismissed for failure to follow the Code. (Koch Dec. ¶ 5; Marcikic Dec. ¶ 6; Exh. 3).

With this background in mind, the court turns to the evidence submitted by the parties. From 2009 through late 2011, Plaintiff participated in the Program without a major incident. Early on, coaches Ms. Martin and Mr. Piszkin were informed by

Plaintiff that she suffered from bipolar disorder. Ms. Martin, the head coach, received numerous emails from Plaintiff, frequently referring to personal matters. Ms. Martin declares that she knew Plaintiff "was struggling in her life, and thought the extra care and attention might be helpful. The problem was that the more attention I gave her, the more attention she would demand. Still, it was hard to stop caring or helping her. She would often tell me that I was her 'guardian angel,' and that I was the only person who could calm her down, so I was determined to help her." (Martin Decl. ¶4). Ms. Martin also assisted Plaintiff during non-work hours. She provided financial arrangements for Plaintiff to remain in the program and provided free training tips, advice, and other support.

Prior to December 2011, Plaintiff "would often blurt out inappropriate comments, yell at others, and disrupt practice." (Martin Decl. ¶8). Such conduct violated the Code and Ms. Martin informed Plaintiff of her inappropriate conduct. Plaintiff's conduct became more disruptive after this point in time when Plaintiff became depressed, began consuming alcohol, and stopped taking her medications. (Talevski Depo. 60:9-62:15, 82:10-12, 90:2-91:1, 95:11-97:10, 117:16-118:16, 119:16-22, 130:24-131:12, 195:9-14).

Mr. Piszkin, an assistant running and triathlon coach, declares that Plaintiff informed him about the traumatic brain injury she suffered as a child and, that he "felt sympathy" for Plaintiff. (Piszkin Decl. ¶¶2-3). During Plaintiff's participation in the Program, he declares that Plaintiff

> often acted like a child. She was self-absorbed in practice, and anyone who did not agree with her was a challenge or a nuisance she had to deal with. She also needed to be the center of attention, and would often interrupt group training sessions or blurt out inappropriate comments, which would detract from the training I could provide other athletes. I sometimes got frustrated with her, but understood the challenges of her medical condition and was determined to provide as much patience with her as possible.

(Piskin Decl. ¶3).

/ / /

/ / /

Mr. Piszkin declares that Plaintiff

> became obsessed with a member of my workout group, Anthony Donohue. Ms. Talevski became convinced that Mr. Donohue was her soul mate, but that the other people in the workout group were conspiring against their relationship. Ms. Talevski was certain one woman in the group was "vexing" her. Mr. Donohue did not feel the same way about Ms. Talevski and was bothered by her conduct. He did not tell Ms. Talevski his real name, but instead, referred to himself as Donnie.
>
> Even though Donnie tried to make it clear he was not interested in Ms. Talevski, she became even more obsessed. Donnie informed me Ms. Talevski had tracked down his battalion (Donnie was in the Navy), called his squadron, and tried to make contact with Donnie. This unnerved him. He expressed to me that while he did not think he was in physical danger, he was worried that she was so attached to him, and was uncomfortable being around her. He stated he was considering not continuing in the Program because her stalking behavior made him uncomfortable.
>
> Donnie ultimately stopped coming to my workout group in late 2011. At that point, Ms. Talevski began bothering me constantly about Donnie, trying to track him down, and any information I could provide. She also started asking about other Program participants who might have information about Donnie. When I refused to help her track down Donnie, Ms. Talevski became extremely angry.

(Id. ¶¶6-8).[1]

Mr. Koch, the Director of Recreation at UCSD, declares that the Code is essential to the Program because most of the group workout sections involve one coach overseeing the workouts of about 50 participants. (Koch Decl. ¶3). Mr. Koch has dismissed 5-7 participants because of failure to comply with the Code. In January 2012, he met with Ms. Martin and Mr. Marcikic and they informed him that Plaintiff had been a participant in the Program for about three years. They informed Mr. Koch that Plaintiff's presence in the Program had been tumultuous and that she had violated the Code. The coaches explained "that they gave second chances for many of these rule violations because they felt bad for her, but they expressed concern that the incidents were becoming more frequent and more severe." (Koch Decl. ¶6). The coaches provided several specific instances of misconduct:

---

[1] Plaintiff objects to the testimony of Piszkin regarding the hearsay statment of Donahue. While the statement is hearsay, the court considers the evidence not for the truth of the statment but for the limited purpose that Piszkin had knowledge that Plaintiff had improper interactions with her co-participants in the Program.

> Ms. Talevski had bullied other participants in the pool by shouting at them until they left the lane open for her to swim. The coaches reported that Ms. Talevski had stalked at least two Program participants (both male), following one man to his home and work, and making extensive efforts to track the second (a Navy Seal), including sending numerous emails and phone calls to the Navy to learn his whereabouts. Both participants had expressed to the coaches that they were uncomfortable continuing in the Program. Further, the coaches described a number of incidents where they had perceived Ms. Talevski to be disruptive in practices, including blurting out inappropriate comments, demanding attention of the coaches, and interrupting workouts. In each instance, the coaches were forced to interrupt the workout to deal with Ms. Talevski, and often could not focus on monitoring the safety of workouts because of her actions. In addition, the coaches reported Ms. Talevski was bombarding Mr. Piszkin and Ms. Martin, with several lengthy emails each day, she would demand special attention from the coaches outside of workout hours, and she was becoming increasingly hostile when coaches would not give her attention outside of workout hours. It appeared Ms. Talevski was also beginning to stalk Ms. Martin.

(Id. ¶7). Mr. Koch considered Plaintiff's conduct a serious violation of the Code "but each interruption by Ms. Talevski required coaches to provide her with individualized attention at the detriment of the safety and training of every other participant." (ID. ¶8).

In late January 2012, Mr. Koch met with Dr. Calfas, the Executive Director of Student Health at UCSD, Ms. Martin and Mr. Marcikic, Director of the Program. Mr. Koch had indicated that Plaintiff's repeated violations of the Code warranted dismissal from the Program but he was concerned, given her bipolar disorder, how she would react to the dismissal and whether there were any other ways the Program might accommodate her presence. Dr. Calfas agreed that Plaintiff's conduct warranted dismissal from the Program:

> The primary concern was the amount of time Ms. Talevski required of the coaching staff. Specifically, it was reported that she would demand individualized attention during group workouts, distract and interrupt the coaches to the point where instruction of the group had to be stopped, bully other participants, and harass the coaches during non-work hours, including sending email barrages (often several emails per day) discussing personal matters with her coaches and visiting her coaches at the worksites of their other jobs. In fact, it appeared to me that Ms. Talevski relied on Ms. Martin to calm her down, help her with her personal problems, and be her friend. This was inappropriate for Ms. Talevski to expect so much from a coach. It was also reported that Ms. Talevski had developed an unwanted romantic interest in another Program participant, a Navy Seal, and had followed him, sent numerous emails to the Navy (including pictures of herself) so the Navy could find him, and delivered

1  correspondence and packages to the Navy for him. The incidents were violations of the Code of Conduct and warranted dismissal.

2  (Id. ¶4).

During the meeting, the individuals also discussed whether there were any means to help or further accommodate Plaintiff and, if not, how best to notify her of the dismissal. Even though Plaintiff had never requested any type of accommodation, the parties discussed the issue and determined that dismissal was appropriate. Dr. Calfas believe that the staff had

> bent over backwards for three years to try and keep Ms. Talevski in the Program, including giving her second chances on her numerous rule violations, giving her all the attention and assistance in practice that she demanded, engaging her outside of work hours to help her with her personal problems, and generally trying to be supportive of her triathlon hobby. To me, it appeared our coaching staff was required to fill the role of Ms. Talevski's full time counselor rather than coach. It was also apparent that the coaching staff, especially Ms. Martin, was emotionally exhausted from accommodating Ms. Talevski. Ms. Talevski's conduct was also having a negative impact on other participants, and the monopolization of the coaches by Ms. Talevski came at the detriment of the other paying participants who complained about it.

(Id. ¶5). Furthermore, as more fully discussed below, the only possible accommodation identified by Plaintiff's exert, Dr. Heidenfelder, "is that Ms. Talevski could have been referred to a mental health counseling unit or program." (Heidenfelder Decl. ¶5).

The court concludes that Defendant has met its burden in demonstrating that Plaintiff's numerous Code violations established a legitimate basis for Plaintiff's discharge from the Program. The court notes that this case does not deal with the accommodation of a disability in the context of fundamental rights such as primary and secondary education or in employment. Rather, the Program is open to the public and provides group classes for participants who desire to improve their physical fitness. Given the group nature of the classes (approximately 50 participants per class with one, possibly two, coaches), Plaintiff's disruptive conduct undermined the ability of the coaches to provide effective group coaching.

Having satisfied its burden, the burden shifts to Plaintiff to come forward with evidence to show that the proffered reasons were a pretext for disability discrimination.

1  Plaintiff argues that there is a question of fact as to whether she violated the Code.
2  Plaintiff declares that she "never followed any athlete from the program outside of
3  practice and never heard anyone complaining about me following them or contacting
4  the police about me following them outside of the program." (Talevski Decl. ¶7). With
5  respect to sending emails to her coaches, Plaintiff declares that Ms. Martin "acted like
6  she was my friend [and] she never told me to stop talking to her or to stop sending
7  emails. We had a normal coach/athlete relationship that had developed into a casual
8  friendship." (Id. ¶12). Plaintiff denies yelling at any people swimming in her lane and
9  "never yelled at another athlete and I never said I intimidated people to keep them out
10 of my swim lane." She also denies interrupting any coach during workouts. With
11 respect to the Navy Seal participant named Donnie, Plaintiff indicates that she spoke
12 with him on only two occasions and when Donnie stopped coming to the Program she
13 did contact the Navy. She was worried that "he had been sent overseas or had been
14 hurt or was missing." When she called the Navy, the recruiter she spoke with asked her
15 to lunch. She also denies stalking an editor from a magazine. She also declares that
16 Mr. Piszkin would repeatedly tease her and make fun of her. (Id. ¶22). In her
17 deposition, Plaintiff acknowledged that she spoke with Donnie after she was dismissed
18 from the Program, after Donnie reported her conduct to the police. (Talevski Depo.
19 31:9-32:5, 215:11-18). At her deposition, Plaintiff testified that she took efforts to
20 interact with Donnie and contacted the Navy about 20 times regarding Donnie.

21  In late December 2012, Plaintiff stopped taking her medications and began to
22 consume alcohol to self-medicate. In January 2012, she informed Ms. Martin that she
23 was planning to commit suicide. At about this same time (after Defendant determined
24 to dismiss Plaintiff from the Program), she alleged that Mr. Piszkin inappropriately
25 touched her during one of the classes.[2] Even after Plaintiff received the dismissal

26

27  [2] An investigation of the alleged incident by both UCSD and the San Diego
    Police did not reveal any misconduct. Mr. Piszkin declares that he only touched
28  Plaintiff's arm, shoulder, and side in front of the entire class for purposes of assuring
    correct positioning. Plaintiff declares that she came from a conservative, religious

letter, Plaintiff declares "no one ever mentioned the Code of Conduct and no one ever said I was doing anything that violated the Code of Conduct." (Id. ¶27). At her deposition, Plaintiff testified that she quarterly signed a form acknowledging that she read and understood the Code. She testified that she understood her conduct had to comply with the Code. (Talevski Depo. 197:1-10).[3]

The court concludes that there is a genuine issue of material fact whether Plaintiff violated the Code. While the overwhelming weight of the evidence favors Defendant, factual determinations, particularly those turning on issues of credibility, are better left to the trier of fact.

Defendant also argues that Plaintiff never requested an accommodation related to her disability and, even if she requested accommodation, Plaintiff fails to identify any viable accommodation. Defendant concludes that it is entitled to summary judgment on this portion of Plaintiff's claim. Plaintiff's expert, Dr. Heidenfelder, M.D., declares that Defendant could have referred Plaintiff to a mental health counseling unit as an accommodation. (Heidenfelder Decl. ¶5). Plaintiff, who has the ultimate burden to show that Defendant failed to reasonably accommodate her disability, only identifies a referral to a mental health expert as a possible accommodation. Plaintiff also argues that Defendant could have suspended her and later readmitted her once she stabilized and began taking her medications.[4] Plaintiff's expert also opines that "[n]o one could have made Ms. Talevski take her medication

---

background and she found the touching inappropriate, even if the investigators found her claim of sexual harassment without merit. (Talevski Decl. ¶24).

[3] The court notes that it has not considered the declarations of Martin and Marcikic about their conversations with the individuals who were purportedly followed by Plaintiff as inadmissible hearsay. As noted by Plaintiff, these declarants cannot provide admissible statements about the truth of the statements by the non-declarants.

[4] The court rejects Plaintiff's notion that Defendant should have accommodated her disability by showing "caring, patience, and tolerance" when she was engaged in a manic episode. (Talevski Depo. 123:21-124:18). Nebulous conduct such as "caring, patience, and tolerance," while laudable in spirit, is simply not an enforceable accommodation. The court also notes that Plaintiff does not submit any evidence to show that she reapplied for entry into the Program once her manic episodes subsided.

if she refused to do so." Id.  The court grants partial summary judgment in favor of Defendant on whether Defendant failed to reasonably accommodate Plaintiff's disability.  It is undisputed that Plaintiff never requested any type of accommodation.  Further, Plaintiff fails to identify or explain how a referral to a mental health professional or an indefinite suspension would have accommodated her disability.  Plaintiff's expert, Dr. Heidenfelder declares that a specialist "could have suggested that Ms. Talevski go back on medication to stabilize her condition." Id.  He further declares, on February 5, 2015, that

> no one could have made Ms. Talevski take her medication if she refused to do so, but the effort and suggestion could have and should have been made.  It is my medical opinion that if Ms. Talevski's bipolar condition is stabilized, with or without medication, there is nothing preventing her from participating in activities such as the UCSD Masters Triathlon Program.

Id.  This evidentiary showing falls short of demonstrating that a referral to a mental health professional would have effectively accommodated Plaintiff's disability. Unlike a ramp for the mobility impaired, or a sign language interpreter for the hearing impaired, that directly addresses and accommodates the disability, a referral to a mental health professional accomplishes nothing.  In other words, the simple referral to a mental health professional, as opposed to treatment, would not have "made Ms. Talevski take her medication if she refused to do so." Id.  There is simply no evidence to show that if Plaintiff were referred to a medical health professional, she would immediately be accommodated.  Dr. Heidenfelder noted that, with treatment, Plaintiff's bipolar condition could be stabilized.  Accordingly, it is not the referral to a mental health professional that has the potential to accommodate Plaintiff's bipolar condition.  Rather, it is the treatment received from a mental health professional that would address, treat, and accommodate Plaintiff's condition.

In reliance upon employment cases, Plaintiff argues that Defendant knew in late 2011 and early 2012 that Plaintiff was exhibiting obsessive-compulsive behaviors and threatened to commit suicide.  Plaintiff argues that her behavior placed the coaches on

1 notice that they were under a mandatory obligation to refer her to mental health
2 professional. This argument is not persuasive. The interactive process contemplated
3 by the ADA

> is a mandatory rather than a permissive obligation on the part of the employers under the ADA and this obligation is triggered by an employee or an employee's representative giving notice of the employee's disability and the desire for accommodation. In circumstances in which an employee is unable to make such a request, if the company knows of the existence of the employee's disability, the employer must assist in initiating the interactive process.

Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1114 (9th Cir. 2000). Here, Plaintiff's claim does not arise under the ADA (although there is substantial overlap with the Rehabilitation Act) nor in the context of employment. Unlike the Rehabilitation Act, the ADA has several provisions specifically targeting employers. See 42 U.S.C. §12115.

Here, it is undisputed that Plaintiff never requested an accommodation. Further, Defendant is not Plaintiff's employer and, under the circumstances of this case, not under a mandatory duty to engage in an interactive process as identified in Barnett. The authorities relied upon by Plaintiff deal with fundamental rights such as employment and education. These fundamental rights are generally considered indispensable to maintaining a productive and sustainable livelihood. In contrast, attending and participating in a group exercise class, one of hundreds of thousands of classes available in San Diego County, is a voluntary and discretionary activity. Plaintiff is one of many voluntary participants in a group exercise class with emphasis on triathlon. Defendant is not under a sua sponte duty to employ mental health professions, or to provide sufficient training to its coaches to become proficient in recognizing debilitating mental health issues in participants in the Program, and then refer that participant to a mental health professional who may or may not provide

/ / /
/ / /
/ / /

successful treatment over weeks, months, or years.[5] (Heidenfelder Decl. ¶5). Under the circumstances of this case, Defendant was not under a duty to engage in a mandatory interactive process. The coaches oversee about 27 classes per week, each with about 50 participants each class. Plaintiff did not enroll in private classes where she could obtain individualized attention, but in large group classes. Under the circumstances of this case, the coaches, who are trainers and not mental health professionals, were not under a mandatory obligation to identify and diagnose Plaintiff's mental health issues, refer Plaintiff for mental health treatment, provide mental health treatment, or engage in an employer-type interactive accommodation.

In sum, the court grants in part and denies in part Defendant's motion for summary judgment. The court denies the motion on whether Defendants violated the Rehabilitation Act by dismissing Plaintiff from the Program. This liability issue, in turn, will be determined by the question of whether Plaintiff violated the Code, the sole remaining genuine issue of material fact following the court's consideration of these motion papers. The court also partially grants the motion to the extent Plaintiff claims that Defendant failed to accommodate her disability.

**IT IS SO ORDERED.**

DATED: April 27, 2015

_____
Hon. Jeffrey T. Miller
United States District Judge

cc: All parties

---

[5] As set forth above, a referral to a mental health profession accommodates nothing. The disability is not accommodated by referral to a mental health professional. Rather, Plaintiff's disability may be accommodated by the receipt of mental health treatment provided over a period of time.